**[J-43-2016]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.**

| | |
|---|---|
| DANIEL E. TAYLOR AND WILLIAM TAYLOR, AS CO-EXECUTORS OF THE ESTATE OF ANNA MARIE TAYLOR, DECEASED | : No. 19 WAP 2015<br>:<br>: Appeal from the Order of the Superior<br>: Court entered April 2, 2015 at No. 2028<br>: WDA 2013, affirming the Order of the<br>: Court of Common Pleas of Washington<br>: County entered November 20, 2013 at<br>: No. 2012-6878. |
| v. | : |
| | : |
| EXTENDICARE HEALTH FACILITIES, INC. D/B/A HAVENCREST NURSING CENTER; EXTENDICARE HOLDINGS, INC.; EXTENDICARE HEALTH FACILITY HOLDINGS, INC.; EXTENDICARE HEALTH SERVICES, INC.; EXTENDICARE REIT; EXTENDICARE, L.P.; EXTENDICARE, INC.; MON VALE NON ACUTE CARE SERVICE, INC. D/B/A THE RESIDENCE AT HILLTOP; MON-VALE HEALTH RESOURCES, INC; JEFFERSON HEALTH SERVICES, D/B/A JEFFERSON REGIONAL MEDICAL CENTER | : ARGUED: April 5, 2016<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |
| | : |
| | : |
| APPEAL OF: EXTENDICARE HEALTH FACILITIES, INC., D/B/A HAVENCREST NURSING CENTER, EXTENDICARE HOLDINGS, INC., EXTENDICARE HEALTH FACILITY HOLDINGS, INC., EXTENDICARE HEALTH SERVICES, INC., EXTENDICARE REIT, EXTENDICARE, L.P. AND EXTENDICARE, INC. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**JUSTICE WECHT**                                         **DECIDED: SEPTEMBER 28, 2016**

The Federal Arbitration Act ("FAA") provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Pennsylvania Rule of Civil Procedure 213(e) requires the consolidation of survival and wrongful death actions for trial. A representative of Extendicare Health Facilities, Inc., d/b/a Havencrest Nursing Center ("Extendicare"), executed an arbitration agreement with Anna Marie Taylor ("Decedent") requiring the arbitration of claims arising from Decedent's stay at the Extendicare facility. Following Decedent's death, Daniel and William Taylor ("the Taylors") brought wrongful death claims on behalf of themselves as wrongful death beneficiaries and survival claims on behalf of Decedent's estate against Extendicare and two other defendants. Extendicare moved to bifurcate the wrongful death and survival actions, and to compel arbitration of Decedent's survival claim pursuant to the arbitration agreement and the FAA.

The trial court relied upon Rule 213(e) to deny Extendicare's motion to bifurcate, and the Superior Court affirmed. We granted review to determine whether the FAA preempts the lower courts' application of Rule 213(e) under the facts presented. Upon review, we conclude that the FAA preempts the application of Rule 213(e), and requires arbitration of the survival claim against Extendicare. We therefore reverse the Superior Court, and we remand to the trial court for further proceedings.

In 2010, Decedent was admitted to Mon-Vale Non-Acute Care Service, Inc., d/b/a The Residence at Hilltop ("The Residence"), a nursing home facility where, on February 1, 2012, she fell and fractured her right hip. Decedent underwent surgery at Jefferson Health Services, d/b/a Jefferson Regional Medical Center ("Jefferson Medical

Center"). Following surgery, Decedent was admitted to one of Extendicare's skilled nursing facilities. On February 9, 2012, as part of the admissions paperwork and pursuant to a power of attorney authorizing him to act on Decedent's behalf, William Taylor executed the Alternative Dispute Resolution Agreement ("ADR Agreement") that is central to this appeal. The ADR Agreement, to which only Decedent (by William Taylor) and Extendicare are parties, provides that any covered disputes arising between the parties are to be submitted to binding arbitration:

> Voluntary Agreement to Participate in ADR. The Parties agree that the speed, efficiency and cost-effectiveness of the ADR process, together with their mutual undertaking to engage in that process, constitutes good and sufficient consideration for the acceptance and enforcement of this Agreement. The Parties voluntarily agree that any disputes covered by this Agreement ([hereinafter] referred to as "Covered Disputes") that may arise between the Parties shall be resolved exclusively by an ADR process that shall include mediation and, where mediation does not successfully resolve the dispute, binding arbitration. . . . The Parties' recourse to a court of law shall be limited to an action to enforce a binding arbitration decision or mediation settlement agreement entered in accordance with this Agreement or to vacate such a decision based on the limited grounds set forth in [the Uniform Arbitration Act, 42 Pa.C.S. §§ 7301, *et seq.*]

Reproduced Record ("R.R.") at 83a-84a. The ADR Agreement purported to require the resolution of all disputes in a single arbitral forum as follows:

> Covered Disputes. This Agreement applies to any and all disputes arising out of or in any way relating to this Agreement or to [Decedent's] stay at [Extendicare's facility] that would constitute a legally cognizable cause of action in a court of law sitting in the Commonwealth of Pennsylvania and shall include, but not be limited to, all claims in law or equity arising from one Party's failure to satisfy a financial obligation to the other Party; a violation of a right claimed to exist under federal, state, or local law or contractual agreement between the Parties; tort; breach of contract; fraud; misrepresentation; negligence; gross negligence; malpractice; death or wrongful death and any alleged departure from any applicable federal, state, or local medical, health care, consumer or safety standards. . . . All claims based in whole or in part on the same incident, transaction or related course of care or services provided by [Extendicare] to [Decedent] shall be addressed in a single ADR process.

R.R. at 84a.

Following her admission into the Extendicare facility, Decedent quickly developed numerous medical complications. She died on April 3, 2012. On October 15, 2012, the Taylors, as co-executors of Decedent's estate, commenced this litigation, ultimately filing a complaint asserting wrongful death and survival claims against Extendicare, The Residence, and Jefferson Medical Center.[1] The Taylors alleged that the combined negligence of the three defendants caused or contributed to Decedent's injuries and death.

In response, Extendicare filed preliminary objections in the nature of a motion to compel arbitration of the Taylors' wrongful death and survival claims, arguing that both claims should be submitted to binding arbitration pursuant to the ADR Agreement. In support of its motion, Extendicare asserted that the Taylors' wrongful death claim was

---

[1]    The Superior Court has explained the distinction between survival and wrongful death causes of action as follows:

> The survival action has its genesis in the decedent's injury, not his death. The recovery of damages stems from the rights of action possessed by the decedent at the time of death. . . . In contrast, wrongful death is not the deceased's cause of action. An action for wrongful death may be brought only by specified relatives of the decedent to recover damages on their own behalf, and not as beneficiaries of the estate. . . . This action is designed only to deal with the economic effect of the decedent's death upon the specified family members.

Pisano v. Extendicare Homes, Inc., 77 A.3d 651, 658-59 (Pa. Super. 2013) (quoting Frey v. Pa. Elec. Co., 607 A.2d 796, 798 (Pa. Super. 1992)).

In this case, the survival action against Extendicare was brought on Decedent's behalf by the Taylors as her co-executors, while the wrongful death action against Extendicare was brought on behalf of the Taylors as the statutory wrongful death beneficiaries. See 42 Pa.C.S. § 8301 (providing that a wrongful death action exists only for the benefit of "the spouse, children or parents of the deceased").

derivative of the survival claim and, because the survival claim was within the scope of the ADR Agreement, both claims must be submitted to arbitration.

On November 20, 2013, the trial court heard oral argument on Extendicare's motion. Although Extendicare maintained that the ADR Agreement required the court to compel arbitration of both of the Taylors' claims against it, Extendicare conceded that the Superior Court recently had held that an arbitration agreement signed only by a decedent did not bind the decedent's wrongful death beneficiaries. See Pisano v. Extendicare Homes, Inc., 77 A.3d 651, 660-61 (Pa. Super. 2013). Shifting its litigation strategy to account for Pisano, Extendicare requested for the first time the bifurcation of the Taylors' two causes of action against it, and an order compelling arbitration just of the survival claim, while the wrongful death claim remained pending for judicial resolution.

Following argument, the trial court overruled Extendicare's preliminary objections. It agreed with Extendicare and the Taylors that, in accord with Pisano, the Taylors could not be compelled to arbitrate their wrongful death claim against Extendicare because they, as wrongful death beneficiaries, were not parties to the ADR Agreement. Trial Ct. Op., 1/29/2014, at 3; see Pisano, 77 A.3d at 660-61 (holding that because wrongful death actions are not derivative of the decedent's rights, the wrongful death beneficiaries were not bound by an arbitration agreement executed by the decedent); see also E.E.O.C. v. Waffle House, 534 U.S. 279, 293 (2002) (holding that, notwithstanding the federal policy favoring arbitration agreements, the FAA does not require parties to arbitrate when they have not agreed to do so).

The trial court also refused Extendicare's request to sever the survival action from the wrongful death action in order to send the former to arbitration. The trial court explained that it found no authority within the FAA to support severance. To the

contrary, the trial court opined that severance would not advance the purpose of the FAA, which, it explained, was "to ease the burden of litigation on the parties and this Court's docket." Trial Ct. Op., 1/29/2014, at 3-4 (citing Joseph Muller Corp. Zurich v. Commonwealth Petrochem., Inc., 334 F.Supp. 1013, 1019 (S.D.N.Y. 1971)). Examining Rule 213(e) of the Pennsylvania Rules of Civil Procedure, the trial court held that it was required to consolidate for trial the wrongful death and survival actions. Pa.R.C.P. 213(e).[2]

Extendicare appealed to the Superior Court, which affirmed.[3] Taylor v. Extendicare Health Facilities, Inc., 113 A.3d 317 (Pa. Super. 2015).[4] The Superior

---

[2] Rule 213(e) provides as follows:

(e) A cause of action for the wrongful death of a decedent and a cause of action for the injuries of the decedent which survives his or her death may be enforced in one action, but if independent actions are commenced they shall be consolidated for trial.

   (1) If independent actions are commenced or are pending in the same court, the court, on its own motion or the motion of any party, shall order the actions consolidated for trial.

   (2) If independent actions are commenced in different courts, the court in which the second action was commenced, on its own motion or the motion of any party, shall order the action transferred to the court in which the first action was commenced.

   (3) If an action is commenced to enforce one cause of action, the court, on its own motion or the motion of any party, may stay the action until an action is commenced to enforce the other cause of action and is consolidated therewith or until the commencement of such second action is barred by the applicable statute of limitation.

Pa.R.C.P. 213(e).

[3] See 42 Pa.C.S. § 7320(a)(1) (providing that an appeal may be taken from "[a] court order denying an application to compel arbitration").

[4] Neither Jefferson Medical Center nor The Residence participated in the appeal, because they were not parties to the ADR Agreement.

Court rejected Extendicare's argument that the Taylors' wrongful death action is dependent upon the rights that Decedent possessed before she died, and that the wrongful death and survival claims together must be submitted to arbitration. The court relied upon Pisano to hold that "an arbitration agreement signed by the decedent or his or her authorized representative is not binding upon non-signatory wrongful death beneficiaries, and they cannot be compelled to litigate their claims in arbitration." Taylor, 113 A.3d at 320-21.

Turning to Extendicare's alternative argument that the trial court should have bifurcated the two claims and compelled arbitration of the survival action pursuant to the ADR Agreement, the Superior Court recognized that this was an issue of first impression in Pennsylvania. The court relied upon Rule 213(e) to hold that the wrongful death and survival actions could not be bifurcated, but must be consolidated for trial. The Superior Court explained that the General Assembly had considered the overlap between wrongful death and survival actions, as well as the potential for duplicative awards, and made the legislative policy decision to require consolidation. Taylor, 113 A.3d at 322 (citing the Wrongful Death Statute, 42 Pa.C.S. § 8301(a)[5]). The Superior Court recognized that Rule 213(e) implemented this policy decision by detailing how and where such claims must be consolidated. Taylor, 113 A.3d at 325.

---

[5]      Section 8301(a) provides as follows:

> (a) General rule.--An action may be brought, under procedures prescribed by general rules, to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no recovery for the same damages claimed in the wrongful death action was obtained by the injured individual during his lifetime and any prior actions for the same injuries are consolidated with the wrongful death claim so as to avoid a duplicate recovery.

42 Pa.C.S. § 8301(a).

Attempting to avoid consolidation, Extendicare relied upon the FAA, which was "intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements." Southland Corp. v. Keating, 465 U.S. 1, 3 (1984). Extendicare argued that the FAA preempted Rule 213(e), and relied upon Marmet Health Care Ctr., Inc. v. Brown, 132 S.Ct. 1201 (2012) for support. In Marmet, the Supreme Court of the United States held that the FAA preempted a state law which precluded the enforcement of pre-dispute arbitration agreements in nursing home disputes involving personal injury or death. See id. at 1204 (observing that West Virginia's prohibition was "a categorical rule prohibiting arbitration of a particular type of claim," and therefore was contrary to the requirements of the FAA). According to Extendicare, the FAA likewise preempted Rule 213(e) to the extent that the rule purported or operated to bar the arbitration of a claim otherwise subject to an arbitration agreement.

Engaging in a conflict preemption analysis,[6] the only form of preemption implicated in this case, the Superior Court disagreed with Extendicare. According to the court, Rule 213(e) did not prohibit the arbitration of wrongful death and survival claims, rendering this case distinct from the categorical prohibition struck down in Marmet.

---

[6]     As the Superior Court recognized, there are several types of preemption. Express preemption is implicated when the federal law contains a provision expressly preempting state law. Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm., 461 U.S. 190, 204 (1983). The second form of preemption is field preemption, where the federal statute "reflects a Congressional intent to occupy the entire field" of law. Taylor, 113 A.3d at 323 (quoting Volt Info. Sci., Inc. v. Bd. of Tr. of Leland Stanford Junior Univ., 489 U.S. 468, 477 (1989)). "Finally, 'a state enactment will be preempted where a state law conflicts with a federal law.'" Stone Crushed P'ship v. Kassab Archbold Jackson & O'Brien, 908 A.2d 875, 881 (Pa. 2006) (quoting Office of Disciplinary Counsel v. Marcone, 855 A.2d 654, 664 (Pa. 2004)). Conflict preemption may be found when it is impossible to comply with both federal and state law, Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963), or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67 (1941).

Rather, the Superior Court viewed the procedural rule as "neutral regarding arbitration generally, and the arbitration of wrongful death and survival actions specifically." Taylor, 113 A.3d at 325. The Superior Court further observed that wrongful death and survival actions may proceed together in arbitration when all of the parties, including the wrongful death beneficiaries, have agreed to arbitration. Id.

In this case, however, the Superior Court found no agreement to arbitrate the wrongful death claim, or to arbitrate the survival actions against The Residence or Jefferson Medical Center. Id. at 326. Rather, the court observed, the only claim subject to an agreement to arbitrate is the Taylors' survival claim against Extendicare. Id. The court observed that the piecemeal disposition Extendicare sought involved "wholly redundant proceedings with a potential for inconsistent verdicts and duplicative damages." Id. The Superior Court held that the wrongful death beneficiaries' constitutional right to a jury trial and the state's interest in litigating wrongful death and survival actions in one proceeding required that all claims proceed in court. Id. at 328. The court viewed its holding as consistent with one of the primary objectives of arbitration, i.e., "to achieve streamlined proceedings and expeditious results," id. (citing AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 346 (2011)), and affirmed the trial court order overruling Extendicare's preliminary objection seeking to compel arbitration.[7]

Extendicare sought discretionary review in this Court. We granted review as to the following issues:

---

[7]    Neither the trial court nor the Superior Court addressed the Taylors' alternative arguments against the ADR Agreement's enforcement, including mistake, lack of consideration, frustration of purpose, impracticability, and unconscionability. These arguments were raised before the trial court in response to Extendicare's request for bifurcation. Because the trial court denied Extendicare's motion to bifurcate, it was unnecessary for it to resolve these alternative arguments.

Does the Superior Court's decision, which refused to compel arbitration of the arbitrable survival claim, violate the [FAA] requirement that arbitration agreements "shall be valid, irrevocable[,] and enforceable[,] save upon [such] grounds as exist at law or in equity for the revocation of any contract"?

Does the Superior Court's conclusion that [Pa.R.C.P. 213(e)] require[s] the consolidation of the otherwise arbitrable survival action with the non-arbitrable wrongful death action on grounds of efficiency violate the [FAA] as it has been interpreted by the United States Supreme Court which has consistently ruled that arbitration is required when there is an agreement to arbitrate even when compelling arbitration results in duplication and piecemeal litigation?

Taylor v. Extendicare Health Facilities, Inc., 122 A.3d 1036-37 (Pa. 2015) (*per curiam*).

Because these are questions of law, our standard of review is *de novo*, and our scope of review is plenary. See Wert v. Manorcare of Carlisle Pa., 124 A.3d 1248 (Pa. 2015).

Extendicare concedes that, pursuant to Pisano, the Taylors' wrongful death claim must be litigated in the trial court. Extendicare contests only the trial court's refusal to sever the arbitrable survival claim from the non-arbitrable wrongful death claim. Relying upon the FAA's directive that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2, Extendicare argues that the United States Supreme Court has interpreted this language as expressing a national policy favoring arbitration that preempts any state law that stands in the way of an agreement to arbitrate.[8]

---

[8] See, e.g., Marmet, 132 S.Ct. at 1204 (holding that "a categorical rule" prohibiting the arbitration of personal injury or wrongful death claims was contrary to the FAA); Concepcion, 563 U.S. at 341 ("When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: the conflicting rule is displaced by the FAA."); Southland, 465 U.S. at 10 ("In enacting § 2 of the [FAA], Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration."); Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 (continued…)

Extendicare criticizes the Superior Court for premising its decision upon notions of expediency and efficiency. In this respect, Extendicare relies upon a line of cases establishing that the FAA's pro-arbitration mandate trumps litigation efficiency. See KPMG LLP v. Cocchi, 132 S.Ct. 23, 26 (2011) ("[W]hen a complaint contains both arbitrable and nonarbitrable claims, the [FAA] requires courts to 'compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums.'" (internal citation omitted)); Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) ("[T]he [FAA] requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums."); Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 20 (1983) ("[The FAA] requires piecemeal resolution when necessary to give effect to an arbitration agreement.").

Extendicare observes that state and federal court decisions in Pennsylvania currently differ regarding the issue presented herein. While the Superior Court in this case relied upon Rule 213(e) to refuse to compel arbitration of an arbitrable claim, the federal courts sitting in Pennsylvania uniformly have rejected Taylor or its rationale.[9]

---

(…continued)
U.S. 1, 24 (1983) ("Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary.").

[9] See, e.g., Golden Gate Nat'l Senior Care LLC v. Sulpizio, 2016 WL 1271333 (M.D. Pa. March 31, 2016); Clouser v. Golden Gate Nat'l Senior Care, LLC, 2016 WL 1179214 (W.D. Pa. March 23, 2016); Erie Operating, L.L.C. v. Foster, 2015 WL 5883658 (W.D. Pa. Oct. 8, 2015); Hartman v. Sabor Healthcare Group, 2015 WL (continued…)

According to these federal courts, whenever Rule 213(e) would prevent the operation of a valid arbitration agreement by prohibiting the bifurcation of an arbitrable survival claim from a non-arbitrable wrongful death claim, it is preempted by the FAA.

In response, the Taylors argue that the trial court's and Superior Court's rulings are not contrary to the FAA or any controlling authority. According to the Taylors, the FAA preempts only state laws or rules that expressly prohibit certain arbitration proceedings. See, e.g., Marmet, 132 S.Ct. 1201; Perry v. Thomas, 482 U.S. 483, 491 (1987). The Taylors argue that Rule 213(e), conversely, is arbitration-neutral. Because the rule does not target arbitration, the Taylors perceive no conflict between the rule and the FAA for purposes of preemption. Indeed, the Taylors echo the Superior Court by asserting that Rule 213(e) is only implicated in this case because Extendicare failed to procure signatures from the wrongful death beneficiaries. According to the Taylors, had Extendicare obtained the appropriate signatures on the ADR Agreement, both the survival and wrongful death claims would be subject to arbitration.

The Taylors also advance alternative arguments that the ADR agreement is unenforceable under state law for reasons that include mistake, lack of consideration, impracticability, frustration of purpose, and unconscionability. Recognizing that the lower courts did not consider these arguments, the Taylors urge this Court either to address them or to remand them to the trial court for resolution.

---

(…continued)
5569148 (M.D. Pa. Sept. 21, 2015); Golden Gate Nat'l Senior Care, LLS v. Beavens, 2015 WL 5000886 (E.D. Pa. Aug. 20, 2015); THI of Pa. at Mountainview, LLC v. McLaughlin ex rel McLaughlin, 2015 WL 2106105 (W.D. Pa. May 6, 2015); N. Health Facilities v. Batz, 993 F.Supp. 2d 485 (M.D. Pa. 2014).

With these arguments in mind, we begin our analysis by reviewing federal preemption doctrine, which springs from the Supremacy Clause.[10] Federal law is paramount, and state laws that conflict with federal law are "without effect." Dooner v. DiDonato, 971 A.2d 1187, 1193 (Pa. 2009) (quoting Altria Group, Inc. v. Stephanie Good, 555 U.S. 70, 76 (2008)). Although federal preemption of state laws may be found in any of three ways, see supra, n.6; Stone Crushed P'ship v. Kassab Archbold Jackson & O'Brien, 908 A.2d 875, 881 (Pa. 2006), Extendicare advocates solely for a finding of conflict preemption. See Volt Info. Sci., Inc. v. Bd. of Tr. of Leland Stanford Junior Univ., 489 U.S. 468, 477 (1989) ("The FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration."). Conflict preemption typically arises where compliance with both federal and state law is impossible, or when the state law stands as an obstacle to the accomplishment of the full purposes and objectives of the United States Congress. Holtz Cigar Co. v. City of Philadelphia, 10 A.3d 902, 918 n.4 (Pa. 2011); see Volt, 489 U.S. at 477.

Turning first to the relevant state law, Rule 213(e) is a rule of compulsory joinder, providing that wrongful death and survival actions "may be enforced in one action, but if independent actions are commenced they shall be consolidated for trial." Pa.R.C.P.

---

[10] The Supremacy Clause of the United States Constitution provides as follows:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2.

213(e).[11]  If independent actions are filed or pending in the same court, or are commenced in different courts, the trial courts "shall" order them to be consolidated.  Id. This procedural rule facially addresses scenarios where the litigants seek to resolve survival and wrongful death claims in court, mandates a single judicial action, and expresses the Commonwealth's interest in the efficient judicial resolution of survival and wrongful death claims and the avoidance of duplicative recoveries.  See Pezzulli v. D'Ambrosia, 26 A.2d 659, 662 (Pa. 1942) ("[T]here is an important limitation on the right to bring actions under both the death acts and the survival statute, namely, that it must not work a duplication of damages.").  Rule 213(e) is silent regarding arbitration, because it does not contemplate the scenario where one claim that is subject to compulsory joinder is also subject to arbitration due to the contractual agreement of the parties.

The FAA is in tension with Rule 213(e).  It is neither exaggeration nor hyperbole to characterize the rise of arbitration over the last century as revolutionizing the rule of law and access to justice.[12]  Prior to the 1925 enactment of the FAA, courts across the

---

[11]    Both of the parties have, at this juncture, confined their arguments solely to the application of Rule 213(e).

[12]    See, e.g., Thomas E. Carbonneau, The Revolution in Law Through Arbitration, 56 Clev. St. L. Rev. 233, 233 (2008) (opining that "[t]he development of a 'strong federal policy favoring arbitration' cast aside traditional acceptations about law and adjudication," and arguing that the rule of law which the human civilization has associated with law and the legal process "has been profoundly, perhaps irretrievably, altered by the rise of arbitration") (citing E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 290 (2002)); Charles L. Knapp, Taking Contracts Private: The Quiet Revolution in Contract Law, 71 Fordham L. Rev. 761, 782-83 (2002) ("[D]enial of access to a court of law in most cases means exactly that—denial of access not merely to a court, or even to a jury, but to the law itself."); Stephen L. Hayford, Commercial Arbitration in the Supreme Court 1983-1995: A Sea Change, 31 Wake Forest L. Rev. 1, 1 (1996) ("One (continued…)

country disparaged arbitration as a renegade form of adjudication, and refused to enforce private arbitration agreements. See Thomas E. Carbonneau, The Revolution in Law Through Arbitration, 56 Clev. St. L. Rev. 233, 244 (2008); see also Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 270-71 (1995) (discussing the historical background of the FAA); Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991) (same). During this time, when arbitration occurred primarily in the commercial context between businesses of equal bargaining power, see Margaret M. Harding, The Clash Between Federal and State Arbitration Law and the Appropriateness of Arbitration As A Dispute Resolution Process, 77 Neb. L. Rev. 397, 400 (1998), the business interests that favored the enforcement of private arbitration agreements began

---

(…continued)
of the most striking recent developments in the civil justice arena is the emergence of commercial arbitration as a viable alternative to traditional litigation.”).

Indeed, Professor Myriam Gilles recently opined that, as a result of the anti-lawsuit movement that nurtured the shift to arbitration over the last thirty years:

> [W]e are now at a unique point in our legal history: one that portends, quite literally, the end of doctrinal development in entire areas of the law. Companies, anxious to avoid . . . exposure . . . are highly motivated to insert confidential, one-on-one arbitration mandates into the standard form agreements that, over these same thirty years, have come to govern their relationships with employees, consumers, direct purchasers, and all manner of counterparties. As a result, all disputes under these agreements—whether they would have otherwise been brought as class or individual claims—will now be shunted into the hermetically-sealed vault of private arbitration, where there is no public, transparent decision-making process, much less *stare decisis*, or common law development. For entire categories of cases that are ushered into this vault—from consumer law, to employment law, to much of antitrust law—common law doctrinal development will cease. This, quite literally, represents the end of law.

Myriam Gilles, The Day Doctrine Died: Private Arbitration and the End of Law, 2016 U. Ill. L. Rev. 371, 372 (2016).

to lobby state governments and Congress for legislation compelling the courts to enforce their bargains. Michael G. McGuinness & Adam J. Karr, California's "Unique" Approach to Arbitration: Why This Road Less Traveled Will Make All the Difference on the Issue of Preemption Under the Federal Arbitration Act, 2005 J. Disp. Resol. 61, 63 (2005). Congress answered the call by enacting the FAA, 9 U.S.C. §§ 1-14, in 1925 as modest legislation to rehabilitate arbitration, Carbonneau, The Revolution, 56 Clev. St. L. Rev. at 245, and to "reverse centuries of judicial hostility to arbitration agreements by placing them on equal footing with other contracts." Shearson/Am. Express v. McMahon, 482 U.S. 220, 225-26 (1987).[13]

The FAA was intended by Congress "first and foremost" to ensure judicial enforcement of arbitration agreements into which parties had entered. Dean Witter, 470 U.S. at 220. Although Congress was not "blind to the potential benefit of [the FAA] for expedited resolution of disputes," id. at 219, the Supreme Court has rejected "the suggestion that the overriding goal of the [FAA] was to promote the expeditious resolution of claims." Id. To address its preeminent concern, Section 2 of the FAA makes arbitration agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.[14]

---

[13]     See also Concepcion, 563 U.S. at 339 (explaining that "[t]he FAA was enacted in 1925 in response to widespread judicial hostility to arbitration agreements"); Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 270 (1995); Volt Info. Sci., 489 U.S. at 474; Dean Witter, 470 U.S. at 220 (explaining that when Congress passed the FAA, it was motivated by a desire to change the existing anti-arbitration climate); Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 195, 415 (1967).

[14]     Section 2 provides, in its entirety, as follows:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy
(continued…)

The text of this section not only embodies Congress' intent to ensure that private arbitration agreements are enforced like any other contract, but also includes the FAA's so-called "savings clause," by which courts may refuse to enforce agreements to arbitrate under state laws that "arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." Perry, 482 U.S. at 492 n.9.

Originally, the FAA was perceived to be a procedural statute applicable only in federal courts. See Lyra Haas, The Endless Battleground: California's Continued Opposition to the Supreme Court's Federal Arbitration Act Jurisprudence, 94 B. U. L. Rev. 1419, 1424 (2014). From these humble origins, however, the FAA has evolved through the Supreme Court's application of conflict preemption into what one commentator has characterized as "a redefinition of civil justice, a modification of the Bill of Rights, and the implicit emendation of the U.S. Constitution." Carbonneau, The Revolution, 56 Clev. St. L. Rev. at 246. According to some, the Supreme Court has interpreted the FAA as a "preemption juggernaut," Lisa Tripp & Evan R. Hanson, AT&T v. Concepcion: The Problem of A False Majority, 23 Kan. J. L. & Pub. Pol'y 1, Fall 2013, defining the contours of the FAA to eradicate any state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of the FAA. Concepcion, 563 U.S. at 352 (citing Hines v. Davidowitz, 312 U.S. 52, 67 (1941));

(…continued)
> thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

McGuinness & Karr, California's "Unique" Approach, 2005 J. Disp. Resol. at 65 ("The Court has broadly interpreted the FAA provisions that direct courts to enforce arbitration agreements, while narrowly construing those provisions that limit the reach of the FAA".).

Beginning with Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395 (1967), the Supreme Court established the doctrinal underpinnings for transforming the FAA into a "preemption juggernaut" by holding that federal courts sitting in diversity jurisdiction were obligated to apply the FAA. Tripp & Hanson, AT&T v. Concepcion: The Problem of A False Majority, 23 Kan. J. L. & Pub. Pol'y, at 1. Twenty years later, in Moses H. Cone, the Court relied upon the Supremacy Clause to hold that the FAA established "a body of federal substantive law of arbitrability." 460 U.S. at 24. Shortly thereafter, the Court held that state and federal courts are bound by the FAA, and that Congress intended to preclude state attempts to undermine the enforceability of arbitration agreements. Southland, 465 U.S. at 10 ("[i]n enacting § 2 of the [FAA], Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration. . . ."); see Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985) (stating that the question of whether claims are arbitrable must be decided with a "healthy regard for the federal policy favoring arbitration").[15]

---

[15] In Southland, the Court elevated the preemptive effect of the FAA above any countervailing concerns for federalism. Southland, 465 U.S. at 19 (Stevens, J., concurring in part and dissenting in part) ("The existence of a federal statute enunciating a substantive federal policy does not necessarily require the inexorable application of a
(continued…)

Since federalizing arbitration in <u>Southland</u>, the Supreme Court has continued to reaffirm its commitment to arbitration by striking down conflicting state laws.[16] In much of its FAA preemption jurisprudence pre-dating <u>Concepcion</u>, the Supreme Court appeared to hold that it was only when a state law expressed an anti-arbitration policy that it was preempted by the FAA. For example, in <u>Doctor's Assoc., Inc. v. Casarotto</u>, the Court held that the FAA preempted a state statute that conditioned the enforceability of an arbitration clause upon a specific notice requirement. 517 U.S. 681, 688 (1996) (explaining that the national policies embodied in the FAA are "antithetical to threshold limitations placed specifically and solely on arbitration provisions"). <u>Casarotto</u> clarified that, although states generally may regulate contracts, they may not decline to enforce arbitration agreements solely because they are arbitration agreements.[17]

---

(…continued)

uniform federal rule of decision notwithstanding the differing conditions which may exist in the several States and regardless of the decisions of the States to exert police powers as they deem best for the welfare of their citizens."); <u>id.</u> at 36 (O'Connor, J., dissenting) ("Today's decision is unfaithful to congressional intent, unnecessary, and, in light of the FAA's antecedents and the intervening contraction of federal power, inexplicable.").

[16]    See Lyra Haas, <u>The Endless Battleground: California's Continued Opposition to the Supreme Court's Federal Arbitration Act Jurisprudence</u>, 94 B. U. L. Rev. 1419, 1425-26 (2014) ("Over time the Court has expanded the reach of these substantive provisions, placing the FAA in a position to preempt a vast swath of state law on arbitration."); Hayford, <u>A Sea Change</u>, 31 Wake Forest L. Rev. at 36 ("All of the major anti-arbitration arguments have been swept aside by the Supreme Court, leaving without succor parties that contract to arbitrate future disputes and subsequently decide they would prefer to adjudicate in court.").

[17]    See <u>Allied-Bruce</u>, 513 U.S. at 272-73 (confronting an Alabama law that made predispute arbitration agreements invalid and unenforceable, and rejecting the argument that the FAA carved out "an important statutory niche in which a State remains free to apply its antiarbitration law or policy"); <u>Mastrobuono v. Shearson Lehman Hutton, Inc.</u>, 514 U.S. 52, 58 (1995) (holding that when the parties in court proceedings include claims that are subject to an arbitration agreement, the FAA (continued…)

By striking down state laws targeting arbitration agreements, the Supreme Court has limited the role of state courts to regulating contracts to arbitrate under general contract law principles in accord with the savings clause, under which it has held that only "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." Casarotto, 517 U.S. at 687; see Allied-Bruce, 513 U.S. at 281; Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 483-84 (1989); Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 226 (1987); Perry, 482 U.S. at 492 n.9 (explaining that "[s]tate law, whether of legislative or judicial origin, is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally").[18] These cases instruct that courts are obligated to enforce arbitration agreements as they would enforce any other contract, in accordance with their terms, and may not single out arbitration agreements for disparate treatment.[19]

---

(…continued)
requires that agreement to be enforced even if a state statute or common-law rule would otherwise exclude that claim from arbitration); Volt Info Sci., 489 U.S. at 477 (providing that a state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" should be preempted); Mitsubishi Motors Corp. v. Soler-Chrysler-Plymouth, Inc., 473 U.S. 614, 627 (1985) (finding no basis in the FAA "for disfavoring agreements to arbitrate statutory claims").

[18] See also Borough of Ambridge Water Auth. v. Columbia, 328 A.2d 498, 500 (Pa. 1974) ("Contracts that provide for arbitration are valid, enforceable and irrevocable, save upon such grounds as exists in law or in equity for the revocation of any other type of contract.").

[19] Consequently, in the realm of arbitration, state law exists solely to determine whether a valid contract exists. Myriam Gilles, Opting Out of Liability: The Forthcoming, Near-Total Demise of the Modern Class Action, 104 Mich. L. Rev. 373, 394-95 (2005) ("While it remains . . . for courts to determine whether a valid contract requiring arbitration exists, all other issues concerning the scope of arbitration agreements are now for arbitrators to decide."); see Kristopher Kleiner, AT&T Mobility L.L.C. v. (continued…)

But the prerogatives of state courts to regulate arbitration agreements even in accord with generally applicable contract defenses such as unconscionability have been called into question. Indeed, in recent years the Supreme Court's preemption juggernaut has gathered momentum.[20] In Concepcion, 563 U.S. 333, the Court held that the FAA preempted California's common-law rule of unconscionability (the "Discover Bank Rule"), which it viewed as an obstacle to the accomplishment and execution of the purposes and objectives of the FAA. In Discover Bank v. Superior Court, 113 P.3d 1100 (Cal. 2005), the California Supreme Court had applied the California Code, which allowed courts to refuse to enforce any contract found to be unconscionable at the time it was made, to conclude that class action waivers are unconscionable and void under certain circumstances.[21] The Discover Bank rule was facially neutral, and applied to class action waivers in arbitration as well as litigation.

---

(…continued)
Concepcion: The Disappearance of the Presumption Against Preemption in the Context of the FAA, 89 Denv. U. L. Rev. 747, 751 (2012).

[20]  See, e.g., Myriam Gilles, Individualized Injunctions and No-Modification Terms: Challenging "Anti-Reform" Provisions in Arbitration Clauses, 69 U. Miami L. Rev. 469 (2015) (providing that "the United States Supreme Court has been on a bit of a pro-arbitration tear recently, upholding ever-more draconian dispute resolution clauses inserted in standard-form contracts against all sorts of legal and policy-based challenges").

[21]  The Discover Bank court explained the rule as follows:

[W]hen the [class action] waiver is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money, then, at least to the extent the obligation at issue is governed by California law, the waiver becomes in practice the exemption of the party "from responsibility for [its] own fraud, or willful injury to the
(continued…)

The Concepcions had responded to an advertisement by AT&T for a free phone, and had entered into an agreement for the sale and servicing of the phone. When they were billed $30.22 in sales tax based upon the phone's retail value, they attempted to sue AT&T in federal court. Concepcion, 563 U.S. at 336-37. Their action later was consolidated with a putative class action alleging that AT&T had engaged in false advertising and fraud. Id. at 337. However, the Concepcions and other members of the class were met with AT&T's attempt to compel arbitration under the contract. Id. The Concepcions opposed the motion, arguing that the arbitration agreement was unconscionable and unlawful under the Discover Bank Rule because it disallowed class actions. Id. at 338. The district court denied AT&T's motion, and the Ninth Circuit Court of Appeals affirmed pursuant to the Discover Bank Rule, which it held was not preempted by the FAA. Id.

In a 5-4 decision authored by the late Justice Antonin Scalia, the United States Supreme Court reversed. The Court held that the FAA's savings clause did not protect the Discover Bank Rule from preemption. According to the Court, "[w]hen state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA." Concepcion, 563 U.S. at 341 (citing Preston v. Ferrer, 552 U.S. 346, 353 (2008)). The inquiry is more complex, however, when a generally applicable doctrine, such as unconscionability, is alleged to

---

(…continued)
      person or property of another." (Civ.Code, § 1668.) Under these circumstances, such waivers are unconscionable under California law and should not be enforced.

113 P.3d at 1110.

have been applied in a manner hostile to arbitration.  Id.  The Supreme Court reiterated that a court may not "rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what . . . the state legislature cannot."  Id. at 341 (citing Perry, 482 U.S. at 493 n.9).  Although the FAA, through Section 2's savings clause, preserves generally applicable contract defenses, the Court held that it did not suggest "an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives."  Id. at 343.  In this respect, the Court held that the Discover Bank Rule, by requiring the availability of class-wide arbitration, interfered with the "fundamental attributes of arbitration" and therefore was "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the FAA.  Id. at 344, 352.

The Supreme Court defined the "fundamental attributes of arbitration" as "lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes."  Concepcion, 563 U.S. at 348.  The Court further defined the "overarching purpose" of the FAA as twofold: to ensure "the enforcement of arbitration agreements according to their terms," and "to facilitate streamlined proceedings."  Id. at 344.  In Concepcion, the majority found that these two goals did not conflict.  Id. at 345.  Acknowledging that the state rule was arbitration-neutral, the Court focused upon the rule's practical effect rather than its text.  The rule's application, according to the Court, interfered with the fundamental attributes of arbitration, and thus was preempted.  Id. at 344.  In reaching this conclusion, the majority rejected the argument that class-arbitration waivers shield corporations from numerous, low-value

claims, which can either be brought as a class action or not at all, explaining that "[s]tates cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons." Id. at 351.

Justice Clarence Thomas concurred, providing the fifth vote for the Supreme Court's preemption holding, based not upon the purposes and objectives of the FAA, but upon a textual analysis of the statute.[22]  In Justice Thomas's opinion, the savings clause, by referring to "revocation," suggested that it applied only to defenses that relate to the formation of the contract, rather than to general contract defenses. Concepcion, 563 U.S. at 354 (Thomas, J., concurring).  For Justice Thomas, the only question presented in Concepcion was whether the Discover Bank Rule pertained to the making of a contract. Id. at 356.  Because the Discover Bank Rule was premised upon public policy, rather than a defense related to contract formation, Justice Thomas did not believe it was a ground for revocation under Section 2's savings clause. Id. at 356-57.

Concepcion is relevant to our analysis not only because it limited application of state law under the savings clause, but also because it defined the "overarching purpose" of the FAA as twofold:  to ensure the enforcement of arbitration agreements according to their terms, and to facilitate streamlined proceedings.  Although the Court

---

[22]     Justice Thomas explained that although he preferred to engage in a textual analysis of the savings clause, the parties did not develop arguments along those lines. He therefore joined the Majority opinion, but took the opportunity to explain his preferred approach.  Moreover, any suggestion that Concepcion resulted in a plurality decision was put to rest in DIRECTV, Inc. v. Imburgia, 136 S. Ct. 463, 468 (2015), in which the Supreme Court, in a clear majority, applied Concepcion to set aside a California court's refusal to enforce an arbitration agreement.  Although the Court acknowledged that Concepcion was "a closely divided case," it held that the states were obligated to apply it.  DIRECTV, 136 S. Ct. at 468 ("The Federal Arbitration Act is a law of the United States, and Concepcion is an authoritative interpretation of that Act. Consequently, the judges of every State must follow it.").

held that the arbitration agreements at issue in <u>Concepcion</u> could be enforced according to their terms, and that doing so would facilitate streamlined proceedings, when these two purposes conflict, the Court has mandated that enforcement trumps efficiency.

In <u>Moses H. Cone</u>, for example, the hospital plaintiff in a state court proceeding, who resisted arbitration, filed claims against two defendants. 460 U.S. at 5. The claims against one defendant, Mercury, were subject to an arbitration agreement. <u>Id.</u> Before the Supreme Court, the plaintiff argued that if it was forced to arbitrate its claims against Mercury, it would be forced to resolve its related disputes in separate forums. <u>Id.</u> at 19-20. The Court did not share the plaintiff's concern for avoiding piecemeal resolution of its claims:

> That misfortune . . . occurs because the relevant federal law requires piecemeal resolution when necessary to give effect to an arbitration agreement. Under the [FAA], an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement. If the dispute between Mercury and the Hospital is arbitrable under the Act, then the Hospital's two disputes will be resolved separately—one in arbitration, and the other (if at all) in state-court litigation.

<u>Id.</u> at 20.

Similarly, in <u>Dean Witter</u>, 470 U.S. 213, the Court examined how to proceed in a lawsuit against a single defendant in which the plaintiff raised a non-arbitrable federal claim (premised upon federal securities law) and a pendent, arbitrable state law claim. The lower court had observed that the denial of arbitration is justified when the facts supporting all of the claims are intertwined, because arbitration could produce results that would bind the judicial forum through issue preclusion. <u>Byrd v. Dean Witter Reynolds, Inc.</u>, 726 F.2d 552, 554 (9th Cir. 1984). The Supreme Court reversed, holding that, under such circumstances, upon the motion of one of the parties, the FAA

requires district courts to compel arbitration of the arbitrable claims, "even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." Dean Witter, 470 U.S. at 217. Examining the mandatory language of Section 2 of the FAA, the Court found that the district court had no discretion not to compel arbitration of an arbitrable claim. Id. at 218 (quoting 9 U.S.C. § 2 (providing that arbitration agreements "shall be valid, irrevocable, and enforceable")). The Court further rejected the efficiency argument that, by declining to compel arbitration, "the court avoids bifurcated proceedings and perhaps redundant efforts to litigate the same factual questions twice." Id. at 217. Rather, the Court expressly elevated Congress' intent to enforce arbitration agreements over any concern it bore for efficiency, and held that any conflict between the FAA's two goals must be resolved in favor of enforcement. Id. at 221 ("The preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation, at least absent a countervailing policy manifested in another federal statute.").

Subsequently, in KPMG, 132 S.Ct. 23, nineteen plaintiffs sued three defendants, raising, *inter alia,* five claims against KPMG, two of which were subject to an arbitration agreement. The state trial court refused to compel arbitration of any of the claims, and the state appellate court affirmed. Id. at 24. In a brief *per curiam* opinion, the Supreme Court summarily reversed. Relying upon Dean Witter, the Court held that state courts must "examine with care" complaints seeking to invoke their jurisdiction to sever arbitrable from non-abirtrable claims, and "may not issue a blanket refusal to compel

arbitration merely on the grounds that some of the claims could be resolved by the court without arbitration." Id.[23]

Collectively, Moses H. Cone, Dean Witter and KPMG instruct that the prospect of inefficient, piecemeal litigation proceeding in separate forums is no impediment to the arbitration of arbitrable claims. Indeed, where a plaintiff has multiple disputes with separate defendants arising from the same incident, and only one of those claims is subject to an arbitration agreement, the Court requires, as a matter of law, adjudication in separate forums.

Moreover, while state courts have attempted to reconcile their state law contract defenses and public policy protections with the preemptive effect of the FAA, see, e.g., Concepcion 563 U.S. at 342 (recognizing that "the judicial hostility toward[] arbitration that prompted the FAA had manifested itself in 'a great variety' of 'devices and formulas' declaring arbitration against public policy"), the United States Supreme Court has endeavored to compel judicial acceptance of private agreements to arbitrate.[24] The FAA is now perceived as applying to almost every arbitration agreement, although the savings clause envisions a limited role for state law. In this respect, arbitration has come a long way from its origin as a mutually agreed-upon method of dispute resolution

---

[23] See also Nationwide Mut. Ins. Co. v. George V. Hamilton, Inc., 571 F.3d 299, 308 (3d Cir. 2009) (recognizing that arbitration agreements must be enforced notwithstanding the presence of persons who are parties to the underlying dispute, but not to the arbitration agreement, and explaining that "the FAA has a policy in favor of [piecemeal litigation], at least to the extent necessary to preserve arbitration rights").

[24] See Hayford, A Sea Change, 31 Wake Forest L. Rev. at 36 ("The contemporary Supreme Court is intolerant of legal maneuvers and other machinations, whatever their origin, intended to avoid the arbitration bargain or delay the commercial arbitration process.").

by two business entities of equal bargaining power, and now is employed in a variety of contracts, many of which are contracts of adhesion.[25] As arbitration clauses proliferate, individuals will ever more broadly exchange their right to a jury trial for basic consumer products or nursing home care.

One of the striking consequences of the shift away from the civil justice system and toward private adjudication is that corporations are routinely stripping individuals of their constitutional right to a jury trial. See U.S. Const. amend. VII (preserving the right to a trial by jury); Pa. Const. art. 1, § 6 (same). While one's right to a jury trial may be waived, it is not at all apparent that signatories to arbitration agreements are aware that they waive their right to a jury trial upon the execution of an arbitration agreement.[26]

The West Virginia Supreme Court of Appeals highlighted this constitutional concern in Brown et al v. Marmet Health Care Ctr. et al, 724 S.E.2d 250 (W.Va. 2011). Relying in part upon the state constitution's provision of the right to a jury trial, W. Va. Const. art. III, § 13, the West Virginia court criticized the Supreme Court's decisions granting the FAA sweeping preemptive effect. Brown, 724 S.E.2d at 278 ("With

---

[25] "Frequently, one cannot purchase a car, apply for a credit card, open a checking or savings account in a bank, purchase stock on a major stock exchange, or take a cruise trip on a major cruise line without having to accept a non-negotiable contract that contains an arbitration clause mandating the arbitration of any and all disputes arising out of that contract." Larry J. Pittman, The Federal Arbitration Act: The Supreme Court's Erroneous Statutory Interpretation, *Stare Decisis*, and A Proposal for Change, 53 Ala. L. Rev. 789, 791 (2002); see Myriam Gilles, Operation Arbitration: Privatizing Medical Malpractice Claims, 15 Theoretical Inquiries L. 671, 678 (2014). Indeed, as Justice Scalia observed in Concepcion, "the times in which consumer contracts were anything other than adhesive are long past." Concepcion, 563 U.S. at 346.

[26] See, e.g., Christine M. Reilly, Achieving Knowing and Voluntary Consent in Pre-Dispute Mandatory Arbitration Agreements at the Contracting Stage of Employment, 90 Cal. L. Rev. 1203, 1208 (2002).

tendentious reasoning, the United States Supreme Court has stretched the application of the FAA from being a procedural statutory scheme effective only in the federal courts, to being a substantive law that preempts state law in both the federal and state courts."). Based upon its belief that Congress did not intend for all arbitration agreements to be governed by the FAA, the state court held that the FAA did not apply to pre-dispute agreements to arbitrate negligence claims in nursing home contracts. Id. at 291-92 ("[A]s a matter of public policy under West Virginia law, an arbitration clause in a nursing home admission agreement adopted prior to an occurrence of negligence that results in personal injury or death, shall not be enforced to compel arbitration of a dispute concerning the negligence.").

On appeal, the Supreme Court was unsympathetic to the state court's concern for the right to a jury trial. In a cursory *per curiam* opinion, the Supreme Court reversed, and chastised the West Virginia court for "misreading and disregarding the precedents of this Court interpreting the FAA." Marmet, 132 S.Ct. at 1202. The Court held that the state's public policy rationale constituted "a categorical rule prohibiting arbitration of a particular type of claim," which the Court held was "contrary to the terms and coverage of the FAA" and, therefore, preempted. Id. at 1204; see Nitro-Lift Tech., L.L.C. v. Howard, 133 S.Ct. 500, 501 (2012) (*per curiam*) (invalidating a state law that required the validity of non-compete provisions in employment contracts to be resolved judicially).[27]

---

[27] Interestingly, upon remand from the Supreme Court, the West Virginia Supreme Court of Appeals again declared that the arbitration agreements at issue could be invalid, this time based upon common-law grounds of unconscionability, and remanded (continued…)

With this Supreme Court jurisprudence in mind, and solicitous of our obligation to consider questions of arbitrability with a "healthy regard for the federal policy favoring arbitration," Moses H. Cone, 460 U.S. at 20, we observe that Section 2 of the FAA binds state courts to compel arbitration of claims subject to an arbitration agreement. 9 U.S.C. § 2 (providing that arbitration agreements "shall be valid, irrevocable, and enforceable"). This directive is mandatory, requiring parties to proceed to arbitration on issues subject to a valid arbitration agreement, even if a state law would otherwise exclude it from arbitration. Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 58 (1995).

The only exception to a state's obligation to enforce an arbitration agreement is provided by the savings clause, which permits the application of generally applicable state contract law defenses such as fraud, duress, or unconscionability, to determine whether a valid contract exists. Casarotto, 517 U.S. at 687; Volt, 489 U.S. at 476; Perry, 482 U.S. at 492 n.9.[28] Pursuant to the savings clause, the compulsory joinder mandate of Rule 213(e) could bar the trial court from bifurcating the Taylors' arbitrable survival action from its pending litigation in state court only if it qualifies as a generally applicable contract defense. Rule 213(e), however, is not a substantive defense, but a procedural mechanism to effectuate the state's interest in the efficient resolution of

---

(…continued)
for the development of a record to assess these common-law arguments. Brown et al v. Marmet Health Care Ctr. et al, 729 S.E.2d 217, 223 (W.Va. 2012).

[28]     The Supreme Court's case law, though, provides little guidance as to what state laws might survive a preemption challenge, because it consistently has held that the FAA preempts state law. See Concepcion, 563 U.S. at 344; Doctor's Assocs., 517 U.S. at 688; Perry, 482 U.S. at 491-92; and Southland, 465 U.S. at 10.

wrongful death and survival actions in one judicial forum.  Thus, it does not fall within the savings clause.

Moreover, even if Rule 213(e) was a generally applicable contract defense, it would fail the test established in Concepcion.  There, the Supreme Court instructed that although the savings clause may save a state law from FAA preemption, it will not do so when a state law prohibits outright the arbitration of a particular type of claim, when a generally applicable contract defense is applied in a manner hostile to arbitration, or when the state rule stands as an obstacle to the accomplishment of the FAA's objectives.  Concepcion, 563 U.S. at 341-43.

As noted, the FAA's objectives are to ensure the enforcement of arbitration agreements and facilitate streamlined proceedings.  Arbitration of a single claim under the facts presented herein, with multiple plaintiffs and defendants and several causes of action remaining in state court, likely will not lower costs or enhance efficiency.  Therefore, the scenario that we are addressing arguably presents a conflict between the two objectives of the FAA, where enforcing the ADR Agreement between Decedent and Extendicare will satisfy the enforcement objective at the expense of efficiency.  Under such circumstances, we are bound by the Supreme Court's directive to favor enforcement over efficiency.  See Moses H. Cone, 460 U.S. at 20; Dean Witter, 470 U.S. at 217; KPMG, 132 S.Ct. at 24.  The Supreme Court has made clear that bifurcation and piecemeal litigation is the tribute that must be paid to Congressional intent.  Dean Witter, 470 U.S. at 217.

In reaching this conclusion, we focus upon the application of Rule 213(e) in practice rather than upon its text or its purpose.  See Concepcion, 563 U.S. at 344.

Whether one characterizes Rule 213(e) as a contract defense or as an arbitration-neutral procedural rule, it was applied in this case to defeat arbitration of the survival claim that Extendicare and Decedent (through her legal representative) agreed to submit to arbitration. Like the Discover Bank Rule that the Supreme Court held was preempted in Concepcion, the application of Rule 213(e) herein "stands as an obstacle" to achieving the objectives of Congress in enacting the FAA, as interpreted by the Supreme Court. Concepcion, 563 U.S. at 352. Thus, as applied herein, Rule 213(e) conflicts with the FAA, and is preempted.

We recognize that Rule 213(e) is a procedural mechanism to control case flow, and does not substantively target arbitration. However, the Supreme Court directed in Concepcion that state courts may not rely upon principles of general law when reviewing an arbitration agreement if that law undermines the enforcement of arbitration agreements. We cannot require a procedure that defeats an otherwise valid arbitration agreement, contrary to the FAA, even if it is desirable for the arbitration-neutral goal of judicial efficiency. See Concepcion, 563 U.S. at 351 ("States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons."). Declining to bifurcate the wrongful death and survival actions against Extendicare in the interest of efficiency would nullify the ADR Agreement, a result not permitted by the Supreme Court's FAA jurisprudence.[29]

---

[29] The dissent speculates that we have interpreted the FAA to divest wrongful death beneficiaries of their statutorily created right to bring a claim in this Commonwealth. The dissent asserts that, under our analysis, a wrongful death action based upon facts which also led to an arbitrable survival action cannot be maintained in court because the wrongful death beneficiaries will not be able to establish that "any prior actions for the same injuries are consolidated with the wrongful death claim so as to avoid a duplicate
(continued…)

In its decision that Rule 213(e) barred bifurcation, the Superior Court expressed concern for the wrongful death beneficiaries' constitutional right to a jury trial. We share the Superior Court's concern, which appears to derive from the potential preclusive effect of arbitration upon the wrongful death beneficiaries in the judicial proceedings,

---

(…continued)

recovery." Dissenting Opinion at 3 (quoting 42 Pa.C.S. § 8301(a)). This novel interpretation of Subsection 8301(a) has not been advanced by the parties in this case, is beyond the scope of our grant of review, and is not before us.

Moreover, we differ with the dissent's reading of Subsection 8301(a). First, once there is a valid arbitration agreement, the claims that are encompassed within that agreement are transferred to a private arbitration forum for deliberation, and no longer are pending in court. There is, therefore, no legal action for the plaintiff to consolidate with the wrongful death claim. Second, once an issue has been referred to arbitration, any judicial proceeding involving that issue is stayed pending the outcome of arbitration. 42 Pa.C.S. § 7304(d). Therefore, the survival claim arbitration will be resolved before the wrongful death action can proceed in the court of common pleas. Thus, the court hearing the wrongful death action may account for any damages awarded in the survival arbitration and "avoid duplicate recovery" as required by Subsection 8301(a). Nothing in this opinion suggests a willingness to countenance duplicative damages. Finally, although the dissent, unlike the parties, has focused upon the Wrongful Death Act rather than Rule 213(e), our preemption analysis herein applies equally to the consolidation requirement of the Wrongful Death Act.

The dissent's interpretation of Subsection 8301(a) to bar the arbitration of a claim subject to a valid arbitration agreement is precisely the sort of obstacle to the accomplishment of the FAA's objectives that the United States Supreme Court has repeatedly rejected. In the face of this controlling authority, the dissent would nonetheless permit a party to avoid a contractual agreement to arbitrate a survival action by adding a wrongful death claim under Subsection 8301(a). The dissent's novel jurisprudence would allow state legislatures to invalidate or nullify federal law simply by including a requirement that is inconsistent with arbitration as an element of a statutory cause of action by, for example, requiring all related issues to be filed in the court of common pleas. The Supreme Court of the United States repeatedly has struck down attempts by state courts to relieve parties of their obligation to arbitrate by relying upon state substantive and procedural laws. We need not like this result. It is what the Supremacy Clause commands.

through application of the doctrine of collateral estoppel.[30]  However, the preclusive effect of an arbitration award upon judicial proceedings is not presently before this Court.  Moreover, although the appellate courts of the Commonwealth have held that "a judicially confirmed private arbitration award will have collateral estoppel effect, even in favor of non-parties to the arbitration, if the arbitrator actually and necessarily decided the issue sought to be foreclosed and the party against whom estoppel is invoked had full incentive and opportunity to litigate the matter," Frog, Switch & Mfg. Co. v. Pa. Human Relations Comm'n, 885 A.2d 655, 661 (Pa. Cmwlth. 2005),[31] we have not addressed this question.  Notably, when the United States Supreme Court considered whether courts should resolve arbitrable pendent claims when a non-arbitrable claim is before it, in order to avoid the possible collateral estoppel effect of the arbitration proceeding in a subsequent court proceeding, the Court acknowledged that the preclusive effect of arbitration proceedings in such circumstances was not well-settled.

---

[30]  As we have explained, collateral estoppel, or issue preclusion, "forecloses re-litigation in a later action, of an issue of fact or law which was actually litigated and which was necessary to the original judgment." Hebden v. W.C.A.B. (Bethenergy Mines, Inc.), 632 A.2d 1302, 1304 (Pa. 1993) (quoting City of Pittsburgh v. Zoning Bd. of Adjustment of Pittsburgh, 559 A.2d 896, 901 (Pa. 1989)).  Collateral estoppel will preclude relitigation of an issue determined in a previous action if five criteria are met:

(1) the issue decided in the prior case is identical to the one presented in the later action; (2) there was a final adjudication on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment.

Office of Disciplinary Counsel v. Kiesewetter, 889 A.2d 47, 50-51 (Pa. 2005).

[31]  See also Dyer v. Travelers, 572 A.2d 762, 764 (Pa. Super. 1990); Ottaviano v. Southeastern Pa. Trans. Auth., 361 A.2d 810, 814 (Pa. Super. 1976).

Dean Witter, 470 U.S. at 222 (observing that "[t]he full-faith-and-credit statute requires that federal courts give the same preclusive effect to a State's judicial proceedings as would the courts of the State rendering the judgment, and since arbitration is not a judicial proceeding, . . . the statute does not apply to arbitration awards"); see McDonald v. W. Branch, 466 U.S. 284, 287-88 (1984) (refusing to accord an arbitration ruling collateral estoppel effect because "arbitral factfinding is generally not equivalent to judicial factfinding"); Barrentine v. Ark.-Best Freight Sys., 450 U.S. 728 (1981). Thus, the preclusive effect of arbitration in judicial proceedings is uncertain. [32]

We sympathize with the position of the AARP as *amicus curiae* in support of the Taylors that "[t]he prevalence of abuse and neglect in nursing facilities . . . make[s] it imperative that victims and their families have fair access to complementary remedial measures available through the civil justice system-particularly when the bad conduct results in the suffering and death of a vulnerable person." *Amicus Curiae* Brief of AARP at 4; id. at 7 (detailing the evidence of significant levels of abuse and neglect in nursing home facilities). As AARP observes, the contract formation process that attends nursing facility admission can be a crisis-driven, stress-laden event involving the

---

[32] One academic has observed that special problems arise when arbitral collateral estoppel is applied in cases involving non-arbitrable claims. G. Richard Shell, *Res Judicata and Collateral Estoppel Effects of Commercial Arbitration*, 35 UCLA L. Rev. 623, 655 (1988) ("Even if all the requisites of collateral estoppel are met in such cases, there still remains the question of whether the findings of arbitrators ought to have preclusive, perhaps dispositive, effects on a nonarbitrable claim, *i.e.*, a claim that the arbitrators are not permitted to hear."). Professor Shell opines that the differences between arbitration and court litigation make the rationales for applying judicial preclusion inapplicable to arbitral preclusion, particularly because of the differences in the social and institutional interests implicated, the relative modes of fact-finding utilized in each forum, and because arbitration awards are frequently unexplained and difficult to interpret. Id. at 659-60.

superior bargaining power of one party over the other. Id. at 14-15. Indeed, nursing home defendants have reaped significant benefits from channeling medical malpractice claims into arbitration to the detriment of medical malpractice victims.[33] We cannot, however, disregard or defy controlling precedent from the United States Supreme Court in order to redress these inequities and deficiencies. DIRECTV, Inc. v. Imburgia, 136 S. Ct. 463, 468 (2015) (observing that the "Supremacy Clause forbids state courts to dissociate themselves from federal law because of disagreement with its content or a refusal to recognize the superior authority of its source"); Marmet, 132 U.S. at 1202 (chastising the state court for misreading and disregarding controlling federal authority).

To the extent the Taylors have presented generally applicable contract defenses to this Court, we decline to address them at this juncture. Because of the trial court's decision not to bifurcate the Taylors' claims, and Extendicare's immediate appeal of that issue, the Taylors have not had the opportunity to present these issues in the lower courts. Nor has Extendicare had the opportunity to respond to them. Moreover, we did not grant allowance of appeal to resolve them. Upon remand to the trial court, the parties will have the opportunity to litigate whether there is a valid and enforceable arbitration contract in accord with generally applicable contract defenses and the FAA's savings clause.

Accordingly, we reverse the Superior Court's order affirming the trial court, and remand to the trial court for the resolution of the Taylors' outstanding issues. Jurisdiction relinquished.

---

[33] See, e.g., Myriam Gilles, Operation Arbitration: Privatizing Medical Malpractice Claims, 15 Theoretical Inquiries L. 671, 673-74 (2014) (examining studies to conclude that long-term-care facilities generally fare better in arbitration than in litigation).

Chief Justice Saylor and Justices Baer and Dougherty join the opinion.

Chief Justice Saylor files a concurring opinion in which Justice Baer joins.

Justice Donohue files a dissenting opinion in which Justice Todd joins.