J-A06040-23

2023 PA Super 75

PENNENERGY RESOURCES, LLC,   :   IN THE SUPERIOR COURT OF
PINE RUN MIDSTREAM, LLC, & PER   :   PENNSYLVANIA
MANAGER, LLC   :
:
:
:
:
v.   :
:
:
:
WINFIELD RESOURCES, LLC   :   No. 979 WDA 2022
:
Appellant   :

Appeal from the Order Entered July 25, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD 20-001043

BEFORE:  OLSON, J., NICHOLS, J., and PELLEGRINI, J.*

OPINION BY PELLEGRINI, J.:                     **FILED: MAY 3, 2023**

This case arises out of two separate demands to arbitrate contractual claims that Winfield Resources, LLC (Winfield) filed against PennEnergy Resources, LLC (PennEnergy) and Pine Run Midstream, LLC (Pine Run).  After filing the demands, Winfield filed a motion for summary judgment in the nature of a motion to compel arbitration.  The trial court denied the motion and stayed the arbitration, concluding that the parties never had a "meeting of the minds" to arbitrate Winfield's contractual claims because its claims arise out of multiple agreements with conflicting arbitration provisions.  For the reasons explained below, we find that Winfield's claims fall within the scope of the agreements' arbitration provisions and reverse and remand.

_____

* Retired Senior Judge assigned to the Superior Court.

**I.**

**The Agreements**

In July 2012, Winfield and PennEnergy entered into a Joint Development Agreement (JDA) to develop oil and gas leases within a defined area of mutual interest (AMI) in Butler and Armstrong Counties. As required by the JDA, the two parties entered into a Joint Operating Agreement (JOA) addressing how they would jointly explore, develop and produce the gas. Under the JOA, both parties had the right to take in-kind or separately dispose of its share of all gas produced from the AMI. Additionally, both the JDA and JOA had dispute resolution provisions requiring the parties to arbitrate any disputes arising out of or related to the agreements.

In 2016, Pine Run was formed to take over from another company as the midstream company gathering the gas production from the wells operated in the AMI. After its formation, Pine Run entered into a Gas Gathering Agreement (GGA) with both PennEnergy and Winfield in January 2017. Under the agreement, PennEnergy (as the producer) and Winfield (as the non-operator) delivered gas to Pine Run (as the gatherer) and Pine Run operated the gas gathering system. The GGA identified two then-unconnected delivery points for the system: the DTI Burke Interconnect and the Big Pine Brewer Interconnect. The GGA also provided that PennEnergy would submit daily nominations on behalf of itself and Winfield informing Pine Run of the volume of gas that they would provide and the desired delivery point for that gas.

Finally, like the JDA and JOA, the GGA required that the parties arbitrate any disputes arising from or related to the agreement.

**First Arbitration Demand**

In November 2018, Winfield exercised its right under the JOA to take its gas in-kind. Less than a year later, in June 2019, Pine Run connected the DTI Burke and Big Pine Brewer delivery points, thus providing an alternative delivery point/market for all gas dedicated to Pine Run.

According to Winfield, PennEnergy and Pine Run initially honored Winfield's daily nominations but PennEnergy soon began unilaterally changing the nominations, causing Winfield to incur additional costs. To illustrate, Winfield alleged in its dispute notice:

> … [On] July 30, 2019, Winfield nominated its gas to be sold 33,000 MMBtus from the DTI Burke Meter and 9,100 MMBtus from the Big Pine Brewer meter. [PennEnergy] has refused to comply with Winfield's request and has, instead, unilaterally, revised those nominations such that 26,000 MMBtus were nominated at the DTI Burke meter and the remaining 16,100 at the Brewer Meter…
>
> * * *
>
> … [PennEnergy's] failure to properly submit Winfield's nominations to [Pine Run] has cost Winfield additional fees related to the transportation costs for unathorized gas sales at the Brewer meter, which are 20¢ per MMBTu more than the transportation costs for gas sales at the Burke meter. By causing Winfield's gas to be sold at higher volumes than nominated at the Brewer meter, [PennEnergy] has cost Winfield substantial additional fees which it did not agree to incur.

R. 1399a.[1]

As a result, in November 2019, Winfield filed a demand for arbitration under both the JOA and GGA with the American Arbitration Association (AAA). In its demand, Winfield named not only PennEnergy and Pine Run as respondents, but also PER Manager, LLC (Manager), an affiliate of PennEnergy.[2] Winfield's demand included four claims: breach of contract against PennEnergy and Manager under the JDA, JOA and GGA; breach of contract against Pine Run; breach of contract against Manager; and conversion against all respondents.

After the AAA informed the parties that it would appoint a "provisional arbitrator," PennEnergy, Pine Run and Manager (collectively, Plaintiffs) filed a complaint in the trial court for declaratory and injunctive relief against Winfield. Besides Manager not being a party to any of the agreements allegedly breached, Plaintiffs emphasized that neither the JDA nor GGA provided for a process involving a "provisional arbitrator." Plaintiffs also contended that the JDA and GGA had conflicting arbitration procedures such as how arbitrators would be selected; how many arbitrators there could be; the timing of arbitration; discovery; and whether awards could include

_____

[1] For the convenience of the parties, we refer to the reproduced record.

[2] PennEnergy is owned and controlled by PER Upstream, LLC, which, in turn, is owned and controlled by Manager. All three are distinct and separate legal entities.

- 4 -

attorneys' fees. Plaintiffs sought an injunction to stay arbitration "until [the trial court] determines what rules or procedures apply to the dispute resolution process and whether Manager can be forced to arbitrate." In February 2020, the trial court granted Plaintiffs' request for relief and ordered Winfield's arbitration stayed "until a final judgment is entered in this case[.]"

**Second Arbitration Demands**

In May 2020, Winfield moved to lift the stay so that it could file new, separate arbitration demands against only PennEnergy and Pine Run. After that request was denied, Winfield went ahead with its plan anyway and, in December 2020, dismissed its pending arbitration that sought arbitration under both agreements and instead filed new AAA arbitration demands separately against PennEnergy and Pine Run. For PennEnergy, Winfield alleged it was entitled to arbitration under the JDA and JOA, raising claims of breach of duty of good faith and fair dealing and conversion. As for Pine Run, Winfield alleged it was entitled to arbitration under the GGA and raised claims of breach of contract, breach of duty of good faith and fair dealing, tortious interference with contract and conversion.[3]

---

[3] In response to the new arbitration demands, PennEnergy and Pine Run filed a joint motion for contempt and further injunctive relief, asserting that separating Winfield's claims into two separate arbitrations solved none of the problems presented by the prior arbitration. Accordingly, they requested that the trial court expand its existing stay to enjoin Winfield from proceeding with the new injunctions.

After filing the new demands, Winfield moved for summary judgment to dismiss Plaintiffs' declaratory action and thus lift the stay of arbitration.[4] Winfield argued that it had mooted Plaintiffs' complaints by (1) dismissing Manager as a respondent, and (2) bringing separate arbitrations against PennEnergy and Pine Run. Concerning the latter, Winfield asserted that any complaints about what arbitration procedures applied to which claims involved questions of procedural arbitrability to be decided by the arbitrator and not the trial court.

Plaintiffs responded that Winfield's claims under the JDA or GGA were not separately arbitrable because Winfield's claims still arose out of multiple agreements that had conflicting arbitration provisions. Because Winfield's claims were hopelessly commingled, Plaintiffs argued that they never agreed to arbitrate the kind of claims that Winfield was trying to raise because they arose out of both the JDA/JOA and GGA. For these reasons, Plaintiffs urged the trial court to continue its stay of arbitration and take over the merits of Winfield's claims.

**Trial Court Decision**

On July 25, 2022, the trial court issued an order (1) denying Winfield's summary judgment motion, (2) staying the new arbitrations, and (3) taking

---

[4] After Winfield filed its new arbitration demands, PennEnergy and Pine Run filed a joint motion for sanctions and injunctive relief in January 2021.

over the merits of Winfield's claims. Winfield timely appealed and, after being ordered to do so, filed a Pa.R.A.P. 1925(b) statement. In its statement, Winfield argued that (1) Plaintiffs' only complaints concerned questions of procedural arbitrability that should not have been decided by the trial court, and (2) Winfield had mooted Plaintiffs' complaints by voluntarily dismissing the first arbitration.

In its Pa.R.A.P. 1925(a) opinion, the trial court determined that, contrary to Winfield's first claim, the main issue in the case was one of substantive rather than procedural arbitrability—that is, whether Winfield's claims were arbitrable at all. **See** Trial Court Opinion (TCO), 9/20/22, at 3. In finding that Winfield's claims were not, the trial court explained:

> … Although it may seem obvious that there is an agreement to arbitrate here because the JDA and GGA both contain arbitration provisions, their simultaneous incompatibility and inseparability in this dispute is key to this inquiry. Where a situation, such as this, frustrates the purpose of arbitration to economically resolve parties' disputes, Pennsylvania courts have previously refused to compel arbitration. **School Dist. of Phila. v. Livingston-Rosenwinkel, P.C.**, 690 A.2d 1321, 1323 (Pa. Commw. Ct. 1997). In that case, the Commonwealth Court did not order arbitration where the dispute "includes parties other than [the parties subject to the arbitration agreement] and includes issues that extend beyond interpretation of the Agreement's terms." **Id**. The Commonwealth Court determined that allowing litigation to proceed in separate forums with separate fact-finders would not promote the swift and orderly resolution of claims, as arbitration is designed to do. **Id**. Here, proceeding in two separate arbitration proceedings and without Manager, who is not a party to the arbitration agreements, presents the same problems of diseconomy and inconsistency.

TCO at 4-5 (some citations omitted).

- 7 -

The trial court found that joining the two arbitrations into one did not work either though, explaining:

> … Pennsylvania courts have held that agreements to arbitrate, like any other contract, must contain essential terms that are enforceable. **Wert v. Manorcare of Carlisle PA, LLC**, 124 A.3d 1248, 1260 (Pa. 2015); **Stewart v. GGNSC-Canonsburg, LLC**, 9 A.3d 215, 219-20 (Pa. Super. Ct. 2010). In both of these cases, the Courts refused to enforce an arbitration agreement where the agreement set forth an arbitration forum and procedures that were no longer enforceable but failed to expressly specify that these terms were non-essential to the agreement to arbitrate. The Courts did not infer an agreement to arbitrate in the absence of the enforceability of these essential terms. Here, Winfield makes the unavailing argument that the parties have some agreement to arbitrate, and that the procedures by which the arbitration will be governed can be determined by an arbitrator. However, the arbitration procedures to which PennEnergy agreed, and those to which Pine Run agreed, remain essential terms. Whether and however an arbitrator may even go about deciding which of these procedures governs the dispute is of no moment, because either PennEnergy or Pine Run will lose the benefit of its bargain for an essential term to the arbitration agreement if they proceed together in a single arbitration proceeding.

**Id**. at 5.

The trial court concluded that this case involves a situation where the parties "failed to anticipate these issues arising when they drafted arbitration provisions with conflicting procedures." **Id**. For support of this conclusion, the trial court cited a Tenth Circuit Court of Appeals decision, **Ragab v. Howard**, 841 F.3d 1134 (10th Cir. 2016), for the proposition that there is no "meeting of the minds" where parties enter into multiple agreements containing conflicting arbitration procedures. **Id**. at 5-6 (citing **Ragab**, 814 F.3d at 1137). Here, the trial court concluded, the JDA's and GGA's

irreconcilable arbitration procedures indicated that the parties never had a "meeting of the minds" with respect to arbitration. *Id*. at 6.

Accordingly, the trial court held that it was constrained to take over the merits of Winfield's claims because "the contracting parties failed to anticipate these issues arising when they drafted arbitration provisions with conflicting procedures." *Id*.

## II.

Because Winfield appeals from the denial of a summary judgment motion, we must first determine whether we have jurisdiction over this matter. *See McDonald v. Whitewater Challengers, Inc.*, 116 A.3d 99, 104 (Pa. Super. 2015) ("[A]n order denying summary judgment is ordinarily a non-appealable interlocutory order."). Winfield argues that the trial court's order was appealable as of right under 42 Pa.C.S. § 7320 and Pennsylvania Rule of Appellate Procedure 311(a)(8). *See* Winfield's Brief at 1. Under Rule 311(a)(8), an appeal may be taken as of right from "[a]n order that is made final or appealable by statute or general rule, even though the order does not dispose of all claims and of all parties." Pa.R.A.P. 311(a)(8). Under Section 7320(a)(1) of the Uniform Arbitration Act, meanwhile, "[a]n appeal may be taken from ... [a] court order denying an application to compel arbitration made under section 7304 (relating to proceedings to compel or stay arbitration)." 42 Pa.C.S. § 7320(a)(1).

In ***Coticcia v. Malcovery Sec., LLC***, 2021 WL 5827318 (Pa. Super. December 8, 2021) (unpublished memorandum), a panel of this Court considered whether an order denying partial summary judgment was appealable as an order refusing to compel arbitration. There, after the appellee filed a shareholder action, the appellant petitioned to compel arbitration because appellee's claims were based on an agreement with an arbitration provision. The trial court partially granted the petition to compel arbitration but found that some of the appellee's claims were not based on the agreement. After discovery, both parties moved for partial summary judgment on the remaining claims. After the trial court denied both motions because there were genuine issues of material fact, appellant appealed.

On appeal, appellant argued that the denial of his motion for summary judgment was immediately appealable under Rule 311(a)(8) because his motion was, in substance, a motion to compel arbitration. The panel agreed and found that although an order denying summary judgment is ordinarily a non-appealable interlocutory order, appellant's summary judgment motion requested that the trial court compel arbitration because the remaining claims relied on the agreement with the arbitration provision. ***Id***. at *4. Accordingly, the panel concluded that when the trial court denied appellant's motion, it effectively declined compelling arbitration, thus rendering its order appealable under Rule 311(a)(8). ***Id***.

The same reasoning applies here.[5] While Winfield did not expressly request that the trial court compel arbitration in its summary judgment motion, it requested that the trial court "lift all stays." **See** R. 479a. Winfield also asserted that neither PennEnergy nor Pine Run have ever disputed the arbitrability of the claims asserted against them, as both parties merely asked for the trial court to determine which arbitration procedures apply to those claims. **Id**. at R. 477a. Winfield also claimed that it had mooted the complaint for declaratory relief by dismissing Manager as a respondent and bringing new, separate arbitrations against PennEnergy and Pine Run. **Id**. at R. 478a. Because Winfield unmistakably sought to lift the stay on arbitration so that it could proceed with the newly-filed arbitration, we hold that the trial court, in denying Winfield's motion for summary judgment, effectively declined compelling arbitration, thus making its order immediately appealable under Rule 311(a)(8).

## III.

On appeal, Winfield raises two issues:

I. Whether the trial court erred in denying Winfield's motion for summary judgment and issuing an order staying the AAA Arbitrations, where the only claims asserted by Plaintiffs in the complaint concern questions of procedural arbitrability.

---

[5] While **Coticcia** is an unpublished non-precedential memorandum decision, it may still be cited for its persuasive value. **See** Pa.R.A.P. 126(b) (providing that unpublished non-precedential memorandum decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value).

II. Whether the trial court erred in denying Winfield's motion for summary judgment and issuing an order staying the AAA Arbitrations, where Winfield voluntarily ameliorated all alleged procedural defects raised by Plaintiffs in the complaint, and thus all claims in the complaint were rendered moot.

Winfield's Brief at 4 (cleaned up).

Winfield's first issue subsumes its argument that its claims against PennEnergy and Pine Run are separately arbitrable under the JDA/JOA and GGA, respectively. To address this issue, we must address the trial court's determination on substantive arbitrability: that the parties never intended to arbitrate contractual claims implicating both the JDA/JOA and GGA, even though all the agreements contain arbitration provisions.

As discussed, Winfield's motion was in effect a petition to compel arbitration. In making that determination, "[w]e employ a two-part test to determine whether the trial court should have compelled arbitration: (1) whether a valid agreement to arbitrate exists, and (2) whether the dispute is within the scope of the agreement." *Davis v. Ctr. Mgmt. Grp., LLC,* 192 A.3d 173, 180 (Pa. Super. 2018) (citations, quotation marks and brackets omitted). "Whether a written contract includes an arbitration agreement and whether the parties' dispute is within the scope of the arbitration agreement are questions of law subject to this Court's plenary review." *In re Estate of Atkinson*, 231 A.3d 891, 898 (Pa. Super. 2020). *See also TTSP Corp. v. Rose Corp.*, 217 A.3d 1269, 1280 (Pa. Super. 2019) ("The resolution of the

two-part test implicates substantive arbitrability, over which the courts have jurisdiction.") (citation omitted).

In determining whether a claim falls within the scope of an arbitration clause, we consider "the factual underpinnings of the claim rather than the legal theory alleged in the complaint." *Saltzman v. Thomas Jefferson Univ. Hosps., Inc.*, 166 A.3d 465, 476 (Pa. Super. 2017) (citation omitted). As we have explained:

> A "broad" arbitration clause in a contract is one that is unrestricted, contains language that encompasses all disputes which relate to contractual obligations, and generally includes "all claims arising from the contract regardless of whether the claim sounds in tort or contract." Thus, **where the arbitration provision is a broad one, and "[i]n the absence of any express provision excluding a particular grievance from arbitration, … only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."**

*Provenzano v. Ohio Valley Gen. Hosp.*, 121 A.3d 1085, 1096 (Pa. Super. 2015) (citations omitted; emphasis added).

> Both Pennsylvania and federal law impose a strong public policy in favor of enforcing arbitration agreements. Accordingly, if a valid agreement to arbitrate exists and the dispute falls within the scope of the arbitration agreement, the dispute must be submitted to arbitration and the [trial] court's denial of arbitration must be reversed.

*In re Estate of Atkinson*, *supra* (citations omitted); *see also Davis*, 192 A.3d at 183 n.13 (stating that "[o]ur Supreme Court [in *Taylor v. Extendicare Health Facilities, Inc.*, 147 A.3d 490, 509 (Pa. 2016)] has instructed courts to 'consider questions of arbitrability with a healthy regard for the federal policy favoring arbitration' ").

Arbitration is a matter of contract, and parties to a contract cannot be compelled to arbitrate a given issue absent an agreement between them to arbitrate that issue. Even though it is now the policy of the law to favor settlement of disputes by arbitration and to promote the swift and orderly disposition of claims, arbitration agreements are to be strictly construed and such agreements should not be extended by implication.

***Elwyn v. DeLuca***, 48 A.3d 457, 461 (Pa. Super. 2012) (citations omitted).

**IV.**

**A.**

With those principles in mind, we first look at the arbitrability of Winfield's claims against PennEnergy. In its demand, Winfield invoked both Section 11.10 of the JDA and Article XVI(E) of the JOA. The JDA provides:

Section 11.10 Dispute Resolution and Arbitration; Waiver of Jury Trial. Any dispute, claim or **controversy arising out of or relating to this Agreement**, including the negotiation, formation, validity, enforceability, interpretation, application, performance, breach, enforcement or termination of this Agreement … whether sounding in contract, tort, statute, equity or otherwise, shall be resolved in accordance with the procedures specified in this Section 11.10, which shall be the sole and exclusive procedures for the resolution of any Dispute.

\* \* \*

(b) If the Dispute has not been resolved by negotiation within 30 days after the Dispute Notice Date, either Party may submit it to binding arbitration in accordance with the Commercial Arbitration Rules then in effect of the American Arbitration Association, except as otherwise provided herein.

R. 89a (emphasis added).[6]

As noted, a "broad" arbitration clause is unrestricted, has language encompassing all contractual disputes relating to contractual obligations, and generally includes "all claims arising from the contract regardless of whether the claim sounds in tort or contract." ***Provenzano***, ***supra***. Judged against those criteria, the JDA's and JOA's arbitration provisions are "broad," covering any disputes, claims or controversies that "arise out of or relate" to the agreements. Neither agreement contains any express provisions excluding any particular grievance from arbitration, and there's no forceful evidence that either Winfield or PennEnergy intended to prevent arbitration of any kind of claim arising from their relationship as the operator and non-operator.

As a result, after review, we find that Winfield's claims against PennEnergy "arise out of or relate" to the JDA and JOA. Regardless of their merits, Winfield's claims against PennEnergy, at least as stated in its demand, "arise out of or relate" to the JDA and JOA, the agreements under which it seeks arbitration against PennEnergy. In its demand, Winfield alleges that after it exercised its right to take gas in-kind under the JOA, PennEnergy failed and refused to honor Winfield's daily nominations. According to Winfield,

---

[6] Article XVI(E) of the JOA contains nearly an identical provision requiring "any dispute, claim or controversy arising out of or relating to this agreement" to be resolved in accordance with the procedures set out in the JOA, all of which essentially mirrored those in the JDA. ***See*** R. 412a.

- 15 -

"[t]his is a clear violation of Winfield's rights under the JOA," and that "the JOA obligates PennEnergy to honor and accurately convey Winfield's nominations."[7]  Winfield asserts the same in its breach of duty of good faith and fair dealing claim, alleging that "PennEnergy has willfully breached, and continues to willfully breach, its duties to Winfield under the JDA in refusing to honor Winfield's express direction as to the nomination of its gas for sale."[8]  Likewise, for conversion, Winfield contends that PennEnergy's actions violate the JDA.[9]  Confined to the allegations in the demand, we find that Winfield's contractual claims against PennEnergy "arise from or relate to" the JDA and JOA, and that PennEnergy would not be forced to arbitrate a claim for which it did not agree to arbitrate under those agreements' arbitration provisions.

**B.**

Whether the same can be said for Winfield's claims against Pine Run is a more difficult question.  We first review the GGA's dispute resolution provision to determine what disputes, claims or controversies it was intended to cover.  Like the JDA and JOA, the GGA's arbitration clause is a "broad" one requiring the parties to arbitrate any claims or disputes that "arise out of or relate" to the GGA.

---

[7] Demand for Arbitration, 12/10/21, at 6 (R. 268a).

[8] *Id*. at 8 (R 270a).

[9] *Id*.

16.7 **Dispute Resolution**.  Any claim or dispute **which arises between the Parties in connection with this Agreement** shall be resolved solely in accordance with the Arbitration Procedures set forth in **Exhibit E** to this Agreement. Any Party may seek a preliminary injunction or other provisions of judicial relief, if in its sole judgment such action is necessary to avoid irreparable damage or to preserve the status quo.  Despite any such protective action, the parties will continue to try to resolve the dispute in accordance with the Arbitration Procedures set forth in **Exhibit E** to this Agreement.  The Parties' agreement to resolve such claims or disputes in accordance with the provisions of **Exhibit E** to this Agreement shall survive the expiration or termination of this Agreement.

R. 125a (emphasis added).

Meanwhile, Exhibit E of the GGA provides, in relevant part:

any and all disputes or claims by any party **arising from or related to this Agreement** that cannot be amicably settled, shall be determined solely and exclusively by arbitration in accordance with the Federal Arbitration Act and using the rules of the American Arbitration Association or any successor thereof when not in conflict with such act.

R. 136a (emphasis added).

These provisions broadly include any disputes or claims by any party that arise from or relate to the GGA, as no express provision excludes any particular grievance from arbitration.  On this point, we note that the GGA includes the JDA in its definitions and references the agreement twice elsewhere in its provisions.  While none of these references relate to the daily nominations of the gas, the parties were still aware of Winfield and PennEnergy's relationship under the JDA and were free to exclude any claims that implicated both the JDA and GGA from being arbitrable under the GGA. Without such an express provision, though, we are again left with a "broad"

arbitration provision and a presumption in favor of finding that the claims are arbitrable under the agreement.

Next, we look at Winfield's allegations against Pine Run in its demand. Throughout its background section, Winfield alleges that Pine Run violated the GGA by accepting PennEnergy's daily nominations on behalf of Winfield, even though Pine Run knew those nominations had been changed by PennEnergy. Winfield alleged that "Pine Run was on notice that PennEnergy improperly revised Winfield's nominations but took no action to honor Winfield's nominations in violation of the [GGA]."[10]  Winfield further alleged that "Pine Run's refusal to acknowledge Winfield's nominations and its complicity with PennEnergy's unilateral rejection and revision of Winfield's nominations of gas Winfield owns … is a clear violation of Winfield's rights under the [GGA.]"[11] Finally, Winfield ended its background by alleging that "Pine Run's willful facilitation of PennEnergy's breach of contract in violation of Pine Run's contractual duties to Winfield under the [GGA] has cost Winfield additional fees related to the transportation costs for the unathorized gas sales at the Brewer meter."[12]

---

[10] Demand for Arbitration, 12/10/21, at 5 (R. 255a).

[11] *Id*.

[12] *Id*. at 6 (R. 256a).

While asserting much of the same in its statement of claims, Winfield also mixed in several allegations about PennEnergy. For instance, in its breach of contract claim, Winfield asserted that "PennEnergy has the duty to accurately convey Winfield's nominations and Pine Run has the duty to honor Winfield's nominations."[13] Winfield added that Pine Run "has willfully facilitated PennEnergy's breach of contract in violation of its contractual duties to Winfield under the [GGA]," as Pine Run was "fully aware of PennEnergy's contractual breach in failing to submit Winfield's nominations as specifically directed by Winfield."[14]

As a threshold matter, we find that Winfield's dispute with Pine Run "arises from or relates to" the GGA, as shown by Winfield's numerous allegations that Pine Run was obligated under the GGA to honor Winfield's daily gas nominations. Again, in the absence of an express provision excluding a particular dispute from arbitration, we presume that Winfield and Pine Run intended to arbitrate any disputes arising from the GGA, and Winfield, at least according to its demand, alleges that Pine Run violated the GGA by failing to honor its daily gas nominations that were submitted through PennEnergy.

The harder question—and the one that the trial court could not get past—is whether Winfield's claims against Pine Run were non-arbitrable

_____

[13] *Id*. at 7 (R. 257a).

[14] *Id*. at 8 (R. 258a).

- 19 -

because they included allegations concerning PennEnergy. According to Pine Run and as the trial court found, Winfield's hybrid claims hopelessly commingled allegations pertaining to the parties' duties under the JDA, JOA and GGA even though Pine Run was not a party to the JDA or JOA. That Winfield freely mixed in allegations about PennEnergy into its claims against Pine Run cannot be disputed. For what purpose Winfield added these allegations into its demand against Pine Run is unclear, since it does not appear that any of Winfield's claims against Pine Run would require it to prove that PennEnergy also breached the JDA and JOA.[15]

That said, we cannot conclude as the trial court did that Winfield's claims against Pine Run were rendered non-arbitrable simply because they included extraneous allegations against PennEnergy. First, as noted, "[t]o determine whether a plaintiff's claims fall within the scope of an arbitration clause, we must consider the factual underpinnings of the claim rather than the legal

---

[15] For its tortious interference of contract claim, Winfield would need to establish the existence of a contractual relationship between itself and Penn Energy. All the remaining elements of the claim would be confined to Penn Energy's actions because the elements for tortious interference with a contractual relations are (1) the existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct. *See Empire Trucking Co., Inc. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 933 (Pa. Super. 2013) (original brackets omitted), (citing Restatement (Second) of Torts § 766 (1979)).

theory alleged in the complaint." **Saltzman**, **supra** (citation and quotation marks omitted). Here, it is hardly surprising that the factual underpinnings of Winfield's claims against Pine Run arise in part out of Winfield's prior contractual relationship with PennEnergy. Indeed, Pine Run was formed for the purpose of taking over as the midstream company gathering the gas production from the wells operated in the AMI. Just because Winfield's claims are not perfectly segregated should not doom their arbitrability, especially when the JDA, JOA and GGA—while being separate agreements—all addressed different aspects of a joint venture to explore, develop, produce and transport gas in the AMI.

Second, because there was an arbitration clause in the GGA, the trial court's determination concerning Pine Run was limited to determining whether Winfield's dispute with Pine Run was "within the scope of the agreement." As discussed, the agreement (GGA) was a "broad" one requiring the parties to arbitrate any disputes or claims "arising from or related to" the GGA. That Winfield included extraneous allegations about PennEnergy does nothing to change that its dispute with Pine Run—that is, that Pine Run was obligated under the GGA to honor Winfield's daily gas nominations submitted by PennEnergy—still falls within the GGA's arbitration provision.

To recap, regardless of what it also alleges in the demand concerning PennEnergy, Winfield is alleging that Pine Run was obligated under the GGA to honor its daily gas nominations, and Winfield now seeks to arbitrate those

claims under the GGA's arbitration clause, which provides for arbitration of any claims or disputes "arising from or related to" the GGA. Because Winfield's claims at the very least "relate to" the GGA, we find that they fall within the scope of the GGA's arbitration and that the trial court erred in concluding otherwise.

## V.

## A.

That does not end our inquiry, however. While we find that Winfield's separate claims against PennEnergy and Pine Run fall within the scope of the parties' respective agreements, there remains the question about whether Winfield can proceed with two separate arbitrations, especially since the JDA and GGA contain conflicting procedures for how arbitration should be conducted on the agreement. As noted, the trial court concluded that allowing the two arbitration proceedings to proceed presented problems of "diseconomy and inconsistency," citing for support the Commonwealth Court's decisions in **School Dist. of Phila. v. Livingston-Rosenwinkel, P.C.**, 690 A.2d 1321 (Pa. Cmwlth. 1997).

In that case, the School District of Philadelphia entered into an agreement with an architectural firm to build a high school. The architectural firm, in turn, retained a mechanical and plumbing engineer for the project. Under their agreement, the architectural firm and engineer agreed to arbitrate any claims arising related to their agreement. When the School District later

sued the architectural firm after the school was built, the architectural firm filed a joinder complaint against several other defendants, including the engineer, alleging they were solely or jointly liable. In response, the engineer filed preliminary objections asserting that its agreement with the architectural firm compelled arbitration. After the trial court denied the preliminary objections, the engineer appealed.

On appeal, the Commonwealth Court held that the engineer could not compel arbitration "because the underlying dispute involves entities which were not parties to the [agreement between the architectural firm and the engineer] and because enforcement of the arbitration provision would frustrate the public policy interest in efficient dispute resolution." *Id*. at 1322.

The Commonwealth Court observed that if the dispute involved only the architectural firm and the engineer, there would be no issues with arbitration given the breadth of the arbitration clause and the law's preference for the settlement of disputes through arbitration. *Id*. at 1322-23. However, the underlying dispute arose from an action filed by a third party—the School District—that was not subject to the agreement with the arbitration clause. *Id*. at 1323.

Moreover, the Commonwealth Court noted, the School District filed its action in the trial court, thus making the Pennsylvania Rules of Civil Procedure applicable. Under Pa.R.C.P. 2252, governing the joinder of additional defendants, the architectural firm had a right to join the engineer as an

additional defendant. Because there was no exception for arbitration in the rule that would limit the architectural firm's right, the engineer could not compel arbitration in place of joinder. *Id*.

Finally, the Commonwealth Court ended its discussion by observing that "enforcement of an arbitration provision where, as here, the underlying dispute includes parties not subject to the arbitration process, would frustrate rather than foster the objectives of alternative dispute resolution." *Id*. If the architectural firm was forced to arbitrate its claims against the engineer, then the architectural firm would have to relitigate the same liability and damage issues in two separate forums with two different fact-findings, which would be "uneconomical for the court as well as the parties involved." *Id*. The Commonwealth Court concluded, "arbitration would not promote the swift and orderly resolution of claims; instead, it would engender a protracted, piecemeal disposition of the dispute." *Id*.

We find the trial court's reliance on *School Dist. of Phila.* misplaced. First, while the underlying dispute there involved entities which were not subject to the arbitration provision (the School District), the dispute here involves parties that are subject to at least one of the agreements (Pine Run) or both (PennEnergy).

Second, the procedural postures of the two cases are different. In *School Dist. of Phila.*, the engineer sought to compel arbitration of a joinder complaint filed in a trial court, even though the Rules of Civil Procedure

- 24 -

provided no exception for arbitration; here, in contrast, Winfield seeks to arbitrate claims that it initiated in arbitration with the AAA making the Commonwealth Court's reasoning inapplicable to this case.

Third, we find the Commonwealth Court's public policy concerns inapplicable here. As noted, because the School District was not a party to the arbitration agreement, the architectural firm would be forced to essentially litigate its joinder complaint two times—once in the trial court against the other defendants and once against the engineer in arbitration. Here, while there be two separate arbitrations for a dispute that arises out of a common set of facts, the separate arbitration proceedings would not litigate the same exact case because, as discussed in the previous section, Winfield's respective claims against PennEnergy and Pine Run arise out of different agreements— the JDA/JOA for PennEnergy and the GGA for Pine Run. While the Commonwealth Court in *School Dist. of Phila.* warned against "protracted, piecemeal disposition of the dispute," we find nothing in its discussion that would support the proposition that the trial court seemed to extract: that two separate arbitrations involving similar facts cannot proceed unless they are joined into one. In the absence of such a directive, we will not read one into the Commonwealth Court's decision.

**B.**

The other case on which the trial court relied was *Ragab v. Howard*, 841 F.3d 1134 (10th Cir. 2016), which the trial court found instructive for the

proposition that there was "no meeting of the minds" because the agreements between the parties contained conflicting arbitration provisions. *See* TCO at 5-6.

In *Ragab*, the plaintiff and the defendant entered into six different agreements, each one containing conflicting arbitration provisions about which rules govern, how the arbitrator will be selected, the notice required to arbitrate and attorneys' fees. When plaintiff later sued in Colorado, defendant moved to compel arbitration. The trial court, however, denied the motion, "concluding that there was no actual agreement to arbitrate as there was no meeting of the minds as to how claims that implicated the numerous agreements would be arbitrated." *Ragab*, 841 F.3d at 1136.

On appeal, by a 2-1 vote, the Tenth Circuit Court of Appeals affirmed. In so doing, the majority observed that while no Colorado court has addressed whether parties can be compelled to arbitrate given conflicting arbitration provisions, other courts have found that irreconcilable differences across multiple arbitration provisions indicate that the parties did not agree to arbitrate. *Id*. at 1137. While recognizing that some courts have compelled arbitration despite the existence of conflicting arbitration provisions, the majority noted that the agreements in those cases provided the solution for such a conflict. *Id*. at 1138. In their case, however, the plaintiff and defendant's agreements contained no such conflict provision. As a result, the majority found that the "conflicting details in the multiple arbitration

provisions indicate that there was no meeting of the minds with respect to arbitration." *Id*.

Justice (then-Judge) Neil Gorsuch dissented from the majority and would have concluded that the parties agreed to arbitrate. *Id*. at 1139 (Gorsuch, J., dissenting). He emphasized that all six of the parties' interrelated agreements contained arbitration clauses. Even though the agreements "differ[ed] on the details concerning how arbitration should proceed," he believed "treating the procedural details surrounding arbitration in this case as nonessential terms would do a good deal more" to effectuate the intent of the parties. *Id*.

As Winfield notes, the Fifth Circuit followed Justice Gorsuch's reasoning a few years later in *Matter of Willis*, 944 F.3d 577 (5th Cir. 2019). There, a bankruptcy court relied on *Ragab* in denying a motion to compel arbitration where two agreements contained arbitration clauses that were similar but not identical. On appeal, the Fifth Circuit declined to follow *Ragab*, finding that the parties' intentions to arbitrate were "unmistakable" considering both arbitration clauses broadly covered "all claims and disputes" between the parties. *Id*. at 582. That the arbitrations contained conflicting provisions did nothing to change that the parties agreed to arbitrate because, "[t]hough the agreements differ over procedural details, they speak with one voice about *whether to arbitrate*." *Id*. (emphasis in original).

After review, we find the reasoning in **Matter of Willis** more persuasive than that in **Ragab**.[16] Here, like the agreements in **Matter of Willis**, the JDA, JOA and GGA each contained broad arbitration provisions requiring arbitration of any claims or disputes "arising out of or related" to the respective agreements. While those agreements may have differed in various aspects about how an arbitration would be conducted under the respective agreements, each agreement agreed on the essential terms that the parties intended to arbitrate any claims related to the contracts. That the agreements differed on the procedures for how arbitration would proceed does nothing to detract from the unmistakable conclusion that the parties still had a "meeting of the minds" to arbitrate any claims arising out of the agreements rather than litigate them in the trial court. As a result, we find the trial court's reliance on **Ragab** unavailing and decline to conclude that the conflicting arbitration procedures between the JDA/JOA and GGA nullify the arbitration provisions contained in those agreements.

Accordingly, we reverse the trial court's order and remand with instructions to the trial court to dismiss Plaintiffs' declaratory action and lift all

---

[16] This Court "is not bound by the decisions of federal courts, other than the United States Supreme Court, or the decisions of other states' courts ... [H]owever, we may use them for guidance to the degree we find them useful and not incompatible with Pennsylvania law." **Eckman v. Erie Ins. Exch.**, 21 A.3d 1203, 1207 (Pa. Super. 2011) (internal citation omitted).

stays on the pending arbitration proceedings that Winfield filed against PennEnergy and Pine Run.

Order reversed; case remanded with instructions to the trial court; jurisdiction relinquished.

Judge Olson joins the opinion.

Judge Nichols concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/3/2023